NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARIA MARTHA MERINO,**

          **Plaintiff,**

**v.**                                                  **Case No. 6:17-cv-1283-Orl-37KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Maria Martha Merino, seeking review of the final decision of the Commissioner of Social Security finding that her previously determined disability ceased as of December 22, 2014. Doc. No. 1. Defendant, the Commissioner of Social Security ("Commissioner"), filed an answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 11, 13. The parties also filed their Joint Memorandum, Doc. No. 19.[1]

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 16. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order. *Id.* at 4.

NOT FOR PUBLICATION

## PROCEDURAL HISTORY.

On July 30, 2010, an Administrative Law Judge ("ALJ") concluded that Merino was disabled as of September 14, 2007. R. 136. The disability arose from back pain with radiculopathy after laminectomy surgery, which was a severe impairment. The ALJ concluded that Merino was not able to sit, stand or walk for sufficient periods to complete an eight-hour workday. R. 133.

On December 22, 2014, the SSA concluded that Merino was no longer disabled as of that date. R. 148. Merino asked for review of that determination. R. 165. On August 10, 2015, a disability hearing officer ("DHO") held a hearing to determine whether Merino's condition had improved related to her ability to work. *Id.* After considering the evidence presented, the DHO concluded that there had been medical improvement in Merino's ability to work since the decision finding her disabled was issued on July 30, 2010, which date is referred to as the comparison point date ("CPD"). R. 175. The DHO concluded that Merino had the ability to perform sedentary work. R. 177. Therefore, the DHO found that Merino was no longer eligible for disability benefits as of December 2014. R. 171, 173.

Merino requested review of the cessation of disability determination by an ALJ. R. 192. An ALJ held a hearing on January 14, 2016, at which Merino, accompanied by an attorney, and a vocational expert ("VE") testified. R. 72-96.

After considering the hearing testimony and the evidence in the record, the ALJ found that Merino had not engaged in substantial gainful activity through December 22, 2014, the date her disability ended. R. 18. The ALJ concluded that as of December 22, 2014, Merino had the following severe impairments: degenerative disc disease of the lumbar spine; degenerative joint

disease of the left knee; and major depressive disorder.  *Id.*  The mental impairment resulted in moderate restrictions in activities of daily living, social functioning and concentration, persistence or pace, with no episodes of decompensation.  R. 19.[2]  The ALJ determined that Merino did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations.  R. 18.

The ALJ found that as of December 22, 2014, Merino had the residual functional capacity ("RFC") to perform sedentary work.  R. 20.  However, later in the decision that ALJ wrote as follows:

> Based on the impairments present as of December 22, 2014, the claimant had the residual functional capacity to perform less than the full range of light work . . . . She can frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds; frequently balance, stoop, crouch, crawl and kneel; must avoid concentrated exposure to vibrations; can perform simple repetitive 1-3 step tasks; can have frequent interaction with the public, supervisors and coworkers; and only occasional changes in the work setting.

R. 22.  In making this determination, the ALJ found that Merino's severe impairments could reasonably be expected to cause her alleged symptoms, but that her allegations concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  R. 23; *see also* R. 26.

The ALJ found that Merino could perform her past work as a hotel cleaner/housekeeper. R. 29.  After considering the testimony of the VE, the ALJ alternatively found that Merino could perform sedentary, unskilled work available in the national economy.  R. 29-30.  Therefore, the ALJ concluded that Merino's disability ended as of December 22, 2014.  R. 31.

---

[2] Later in the decision, however, the ALJ wrote that Merino's mental impairment was not severe.  R. 21.

NOT FOR PUBLICATION

Merino requested review of the ALJ's decision by the Appeals Council. R. 8. On May 16, 2017, the Appeals Council found no reason to review the ALJ's decision. R. 1-4.

Merino now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Merino having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## LAW GOVERNING DETERMINATION OF CESSATION OF DISABILITY.

After an individual is awarded disability benefits by the SSA, those benefits will cease upon a showing by the Commissioner that there has been medical improvement related to the ability to work. 42 U.S.C. §§ 423(f), 1382c(a)(4); *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982). Comparison of original medical evidence and new medical evidence is necessary to make a finding of improvement.[3] *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir. 1984) (per curiam). The point of comparison is the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether the claimant was disabled or continued to be disabled. 20 C.F.R. §§ 404.1594(b)(7), 416.994(b)(1)(iv)(C)(vii).

---

[3] Medical improvement is assessed by review of "symptoms, signs and/or laboratory findings." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). Symptoms are the claimant's description of impairments. 20 C.F.R. §§ 404.1528, 416.928. Signs are observable by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are from medically acceptable laboratory techniques. *Id.*

NOT FOR PUBLICATION

Any determination regarding whether benefits continue must be made "on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. §§ 423(f), 1382c(a)(4). It remains the Commissioner's duty to prove medical improvement by substantial evidence. *Id.*; *see also* 20 C.F.R. §§ 404.1594(a), 416.994(a).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated an eight-step inquiry that must be followed in determining whether benefits may be terminated for medical improvement. In sum, the ALJ must ask:

(1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)

(2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in [20 C.F.R. Part 404, Subpart P, Appendix 1]? (If so, the disability is continuing.)

(3) If not, has there been medical improvement?

(4) If there has been medical improvement, is it related to the claimant's ability to do work?

(5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)

(6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)

Case 6:17-cv-01283-RBD-KRS   Document 20   Filed 06/26/18   Page 6 of 19 PageID 951

NOT FOR PUBLICATION

(7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)

(8) If not, is the claimant able to perform other substantial gainful activity?

*Griego v. Sullivan*, 940 F.2d 942, 944 n.1 (5th Cir. 1991) (per curiam) (citing 20 C.F.R. § 404.1594(f)); 20 C.F.R. § 416.994(b)(5).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the ALJ's decision and the Joint Memorandum, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Merino's privacy to the extent possible.

Merino was born in 1967. She attended school through the twelfth grade in the Dominican Republic, but she did not complete that grade. R. 115-16. She spoke Spanish, but she understood a little bit of English. R. 99, 302; *see also* R. 92 (the ALJ stated that Merino performed her past work speaking only in Spanish). Merino testified at the ALJ's hearing through a Spanish translator. *See, e.g.,* R. 74.

During the ALJ's 2016 hearing, Merino testified that she suffered from severe depression starting in 2012. R. 79. She also suffered from pain in her back radiating into her legs. R. 79. She also had weakness in her left knee. R. 81; *see also* R. 172. Medications helped to alleviate the pain but made her made her sleepy, dizzy and exacerbated her stomach gastritis. R. 82, 319, 321. She wrote that she used a brace/splint daily. R. 318.

During a typical day, Merino watched television, read, and visited with family who came to her house to see her. R. 82, 327. She could care for her personal hygiene, albeit slowly. R. 82.

NOT FOR PUBLICATION

She could drive a car but she did so only when necessary. R. 81. She did not perform household chores. R. 84. On bad days, which occurred about 2 times a week, she spent the day lying down with her feet elevated, changing positions repeatedly from lying down to standing. R. 82-83, 86. On a good day, she estimated that she could sit in one place for less than 30 minutes due to pain and pressure in her back. R. 85. She could walk less than 2 blocks due to pain in her back and problems with her knees. She could lift and carry 10 pounds. She could not bend. R. 86. In a written report prepared in 2014, Merino indicated that she had no problem completing tasks. R. 310. In another written report, she indicated that she could prepare simple food and that she tried to go to church every Sunday. R. 314, 316. She also indicated that she could shop once a month with someone with her and that she could also shop by computer. R. 315.

*Physical Impairments*.

Medical records reflect that Merino underwent an L-4 to S1 laminectomy with fusion on May 13, 2013. R. 415. On October 31, 2013, an x-ray of the lumbar spine showed degenerative and postsurgical change with retrolisthesis (vertebra misalignment) of L5 in relation to S1 and loss of disc space height at L4-5 and L5-S1. R. 396.

Treatment notes from Jose Andrade, M.D., at the Allergy, Asthma, Arthritis Center of Central Florida, consistently reflect that in 2013 and 2014 Merino had an unremarkable gait and station, and that no symptoms of depression were observed. *E.g.,* R. 587, 594, 602, 606, 610, 615.

Treatment records from Glenda Gonzalez, M.D., reflect that in 2014 and 2015, Merino complained of low back pain radiating to her right leg which interfered with her daily activities. *E.g.,* R. 620, 622. On September 30, 2014, Merino complained of muscle spasms and back pain. Upon examination, Dr. Gonzalez observed decreased flexion in the lumbar spine. Her assessment

was lumbosacral spondylosis without myelopathy. She treated Merino with Gabapentin. R. 626-27. On January 22, 2015, Dr. Gonzalez observed decreased flexion in the lumbar spine and a straight-leg raising test was positive for pain in the right leg. Her assessment was postlaminectomy syndrome of the lumbar region. R. 622-23. On February 18, 2015, Dr. Gonzalez observed tender paraspinal muscles with decreased flexion in the lumbar spine. R. 620.

A CT scan of the lumbar spine taken on January 28, 2015, revealed retrolisthesis of L5 on S1 that had increased since a previous study, slightly increased mild to moderate neural foraminal narrowing with increasing disc height loss at L4-5. R. 664.

On July 30, 2015, x-rays of Merino's knees showed mild joint space narrowing. R. 770, 772. An x-ray of the lumbosacral spine showed osteopenia with postsurgical change. The radiologist observed "loss of disc space height at L4-5 and L5-S1." He also noted that "[t]o further assess the central canal and nerve roots, MRI could be performed." R. 771.

On August 8, 2015, Merino returned to Dr. Gonzalez complaining of constant low back pain radiating to both legs "'as bad as it was before last surgery[.]'" She also had weakness in her extremities. She also reported being depressed because she could not go through a day without pain. R. 782. Upon examination, Dr. Gonzalez observed low back tenderness with limited range of motion due to pain. R. 783. She referred Merino to a neurosurgeon for evaluation of her low back pain. R. 781.

Vrajlal L. Rajyaguru, M.D., with Advanced Pain Clinic, treated Merino from March 2 through at least October 8, 2015. R. 798-842. Dr. Rajyaguru is board certified in Anesthesiology, Pain Management and Pain Medicine and he is a Fellow of the American Board of Disability Analysts. R. 823. During the initial evaluation, Merino complained of lower back

pain and sacral pain radiating into her right hip and leg.  R. 838.  Medication, home exercise and nerve blocks did not give her lasting relief.  She reported that on a good day her pain was 7 and on a bad day her pain was 8 on the 10-point pain scale.  Pain interfered with her activities of daily living.  R. 838-39.  Upon examination, Dr. Rajyaguru observed limitation of range of motion in the lumbar spine.  A reverse straight-leg raising test and Phasent's Test (hyperextension of the lumbar spine) were positive for lower back pain.  Palpation revealed paraspinal tenderness at the L1 through L5 facet joints and tenderness in the sacroiliac joint.  A Patrick's test was positive for pain in the sacroiliac joint and a thigh thrust test was positive for pain in the sacral area.  He also observed dysesthesia in the L5 and S1 dermatome.  Additionally, he noted right hip tenderness with decreased range of motion with a positive straight-leg raising test.  His assessments included spondylosis, foraminal stenosis, lumbar nerve root irritation, lumbar radiculopathy, lumbago, sacroiliitis, hip bursitis, sciatica and lumbar post laminectomy syndrome.  R. 840-41.  Dr. Rajyaguru recommended that Merino continue with her medication and receive injections in her right hip and back to treat her pain.  He administered an injection of Kenalog in her right hip.  R. 842.

On March 16, 2015, Merino returned to receive injections for the right L5 and S1 nerve roots.  R. 835-36.  She received 50% pain relief.  R. 832.  However, on March 30, 2015, she again reported pain in her lower back, sacral area and legs.  Upon examination, Dr. Rajyaguru observed paraspinal tenderness at the L1 through L5 facet joints increasing with hyperextension and lateral flexion.  Tenderness to palpation was also observed at the sacroiliac joint and Patrick's test, thigh thrust test and straight-leg raising tests were positive for pain.  R. 832.  Dr. Rajyaguru administered another injection for the L3 and L4 nerve roots.  R. 833-34.

On April 27, 2015, Merino still complained of pain at 9 on a 10-point pain scale. Upon examination, Dr. Rajyaguru observed paraspinal tenderness between the T12 and L4 facet joints and on the sacroiliac join. Tests for pain were again positive. R. 828. He administered a diagnostic medial branch block, which provided 90% relief in the lower waist-line area but not in the sacral area. Dr. Rajyaguru opined that this result implied that pain was generated in the sacroiliac joints. R. 830.

On May 18, 2015, Merino reported continuing pain at 9 on a 10-point pain scale. R. 824. Examination confirmed paraspinal and sacroiliac joint tenderness. A Patrick's test was positive for pain in the sacroiliac joint but straight-leg raising tests did not reveal leg pain. R. 824. Dr. Rajyaguru administered another medial branch block, which gave Merino 90% relief in the waist-line area but no relief in the sacral and upper leg area. R. 826.

On June 1, 2015, Merino reported that she received 50% pain relief in her spine, but that it did not last more than a couple of days. Dr. Rajyaguru's findings on examination were essentially the same as his May 18, 2015 findings. R. 820. He administered sacroiliac joint lateral branch blocks, which gave Merino 90% relief in the sacral and hip areas but did not relieve pain in the waist-line area. R. 822.

On June 15, 2015, Merino reported pain at 10 on a 10-point pain scale. She reported 60% pain relief from the previous procedure but that it did not last long. R. 815. Dr. Rajyaguru administered a radio-frequency ablation ("RFA") at the sacroiliac joint. R. 816-18. On June 29, 2015, Merino reported 60% pain relief from the RFA in the buttock, hip and lower back, but no relief in the sacral area. R. 810. Upon examination, Dr. Rajyaguru observed tenderness on

10

palpation of the sacroiliac joint and paraspinal tenderness at the L1 through L5 facet joints with a positive Patrick's test. R. 811. Dr. Rajyaguru administered another RFA procedure. R. 812-13.

On July 16, 2015, Merino reported that she received more than 60% pain relief from the previous RFA in the buttock and hip, but she reported significant pain in her lower back. R. 806. Examination revealed paraspinal tenderness at the L1 through L5 facet joins. Dr. Rajyaguru administered another RFA procedure. R. 806-08. The procedure provided 60% pain relief but on August 6, 2015, Merino reported pain in the lower back at 10 on a 10-point pain scale. The treatment note reflects that pain interfered with her activities of daily living and increased with standing, moderate walking, bending, twisting at the lower spine, sitting and lifting less than 10 pounds. R. 802. Upon examination, Dr. Rajyaguru observed paraspinal tenderness between T12 and L4 on the facet joints exacerbated with hyperextension and lateral flexion. R. 803. He administered another RFA procedure. R. 803-04.

On October 1, 2015, Dr. Rajyaguru prepared a Medical Source Statement of the Ability to Do Work Related Activities (Physical). He opined that Merino could lift and/or carry 20 pounds occasionally and less than 10 pounds frequently. She could stand and/or walk less than 2 hours and sit less than 6 hours in an 8-hour workday. She could never climb or balance and only occasionally kneel, crouch or crawl. He wrote that these restrictions arose from back pain, back surgery and decreased range of motion. He further opined that Merino would have no manipulative, visual/communicative or environmental limitations. R. 794-96.

On October 8, 2015, Merino reported pain in her hips and knees at 9 on a 10-point pain scale. Upon examination, Dr. Rajyaguru noted tenderness on palpation of the trochanteric bursa

11

with slight restriction of range of motion. The lumbar examination had improved from the last examination. R. 798.

### *Mental Impairments.*

Medical records also confirm that in 2012 Vivian Charneco, M.D., diagnosed Merino with a major depressive disorder, severe with a global assessment of functioning ("GAF") score of 45. R. 742. Dr. Charneco treated Merino for this condition through at least March, 2015. R. 706-42. On September 10, 2013, Dr. Charneco noted that Merino had shown improvement and discharged her. R. 715.

Merino returned to Dr. Charneco on January 26, 2015 complaining of depression, anxiety and insomnia affecting her ability to function. Dr. Charneco observed that Merino's affect was anxious and her mood dysphoric with poor attention. Her assessment was major depressive disorder, recurrent, moderate with a GAF score of 55. R. 712. She prescribed medication. R. 711.

On February 27, 2015, Merino returned to Dr. Charneco reporting that she was very anxious and having problems sleeping. Dr. Charneco observed that Merino had an appropriate affect with a dysphoric mood. She adjusted Merino's medication and prescribed psychotherapy. R. 708-09. On March 3, 2015, Merino's condition were the same, with a current GAF score of 55. R. 706-07.

### *Reviewing Professionals' Functional Capacity Assessments.*

On December 15, 2014, Thomas Bixler, M.D., prepared a physical functional capacity assessment after review of the records. He opined that Merino could lift/carry up to 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk and sit each about 6 hours in

an 8-hour workday. She could only occasionally climb, balance, kneel, crouch and crawl due to back pain. R. 563-70. On April 22, 2015, Robert Steele, M.D., also prepared a physical functional capacity assessment after review of the records. He concurred with Dr. Bixler's opinion regarding Merino's ability to sit, stand, walk, lift and carry. As for postural limitations, he opined that Merino would be only occasionally limited in balancing. He indicated that Merino should avoid concentrated exposure to vibration. R. 760-67.

On December 17, 2014, Candace Mihm, Ph.D., prepared a mental functional capacity assessment after review of the records. She noted that Merino suffered from depression. She opined that Merino would have mild limitations in activities of daily living and in maintaining concentration, persistence or pace with no limitations in social functioning and no episodes of decompensation. R. 571-83. On April 13, 2015, Angeles Alvarez-Mullin, M.D., also prepared a mental functional capacity assessment after review of the records. Dr. Alvarez-Mullin's assessment was substantially the same as the assessment by Dr. Mihm. R. 746-58.

*Vocational Expert Testimony.*

During the 2016 hearing, the ALJ asked the VE to assume a hypothetical person "working at the light exertional level; who could frequently climb ramps and stairs; could only occasionally climb ladders, ropes, and scaffolds; could frequently balance, stoop, crawl, crouch, and kneel; [and who] could not work in any environments where there was concentrated vibration." R. 90. The ALJ also added a restriction to "simple, repetitive one- to three-step tasks with only frequent interaction with the public on a face-to-face basis, supervisors, and coworkers and only occasional changes in the work setting[.]" R. 91. The VE testified that this hypothetical person could perform Merino's past work as a hotel cleaner, which she had performed speaking only Spanish.

13

R. 90, 92. However, if the individual could only perform sedentary work, the VE testified that the person could not work as a hotel cleaner. R. 91. The VE testified that there would be other sedentary jobs the hypothetical person could perform, specifically addresser, pari-mutuel ticket checker and surveillance-systems monitor. *Id.* However, if the person spoke only Spanish and no English, the VE testified that there would be no unskilled, sedentary jobs the person could perform. R. 92.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, counsel for Merino asserts three assignments of error. She contends that the ALJ erred in his RFC assessment by giving only some weight to the opinions of Dr. Rajyaguru, a treating physician. She asserts that the hypothetical questions to the VE were not complete because of the error in consideration of Dr. Rajyaguru's opinions and because the ALJ did not include moderate limitations in pace. Finally, she argues that the credibility finding was merely a boilerplate statement not supported by explicit and adequate reasons. Counsel asks that the final decision of the Commissioner be reversed and that the case be remanded for further proceedings. These are the only issues I will address.

*Opinions of Dr. Rajyaguru.*

Dr. Rajyaguru was a physician who treated Merino's pain in the lower back, sacral area and hips beginning shortly after the December 22, 2014 medical improvement date. The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Because Dr. Rajyaguru is also a pain management specialist, more weight is given to his opinion of about a medical issue related to his area of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

NOT FOR PUBLICATION

The ALJ did not credit Dr. Rajyaguru's opinions regarding Merino's ability to sit, stand and walk. In support of this finding, the ALJ stated that these opinions (1) did not appear to have considered Merino's subjective complaints reflected in Dr. Rajyaguru's treatment notes (Exhibit B18F); (2) were inconsistent with the x-ray of the lumbosacral spine taken on July 30, 2015 (Exhibit B14F); and, (3) were inconsistent with treatment notes that "demonstrate significant, successful treatment with nerve blocks/ablations." R. 27.

It is not clear what the ALJ meant by the first of these reasons.[4] As discussed in the summary of facts above, Merino consistently complained to Dr. Rajyaguru of pain at levels of 7 and 10 on a 10-point pain scale. Dr. Rajyaguru considered these complaints, as demonstrated by his reference to back pain and decreased range of motion as support for his functional capacity finding. Moreover, consideration of subjective reports of pain are part of the analysis used by pain management specialists such as Dr. Rajyaguru. Pain management specialists "use a broad-based approach to treat all pain disorders, ranging from pain as a symptom of a disease to pain as the primary disease." Am. Bd. of Pain Medicine, *What is Pain Medicine?*, www.abpm.org/what (last visited June 25, 2018). Perhaps the ALJ meant to imply that Dr. Rajyaguru did not consider Merino's reports that she received temporary pain relief from the procedures he performed. But this reading is also not supported by the record. Dr. Rajyaguru's reports document that various

---

[4] Other portions of the ALJ's decision are also confusing. For example, the ALJ stated that he gave some weight to Dr. Rajyaguru's opinion that Merino did not have manipulative or environmental limitations but followed that finding with the statement that "[t]he unlimited assessments for manipulative limitations are not consistent with the treatment note limitations[.]" R. 26. He found that Merino would have moderate limitations in activities of daily living, social functioning and concentration, persistence or pace, R. 19, but then concluded that Merino did not have a severe mental impairment, R. 21. The ALJ also did not address the inconsistency between his finding that as of December 22, 2014, Merino had the RFC to perform sedentary work, R. 20, and his RFC assessment that she could perform less than the full range of light work, R. 22. This inconsistency is material because the VE testified that a person who had the ability to perform only sedentary, unskilled work who could only speak Spanish could not perform any work available in the national economy. R. 92.

15

procedures relieved pain at one location but not at another, and that Merino reported receiving only temporary pain relief. Notably, Merino's reports of pain to Dr. Rajyaguru are consistent with her complaints of pain to Dr. Gonzalez.

Similarly, it is not evident what the ALJ found materially inconsistent between the July 30, 2015 x-ray report and Dr. Rajyaguru's functional capacity assessment. The radiologist who interpreted the July 30, 2015 x-ray wrote that imaging showed, among other things, loss of disc space height at L4-5 and L5-S1, which is consistent with the January 28, 2015 CT scan of the lumbar spine which revealed disc height loss at L4-5 and L5-S1. Notably, the radiologist who interpreted the July 30, 2015 x-ray also wrote that an MRI could be performed to further assess the central canal and nerve roots.

Finally, substantial evidence in the record does not support the ALJ's third reason for not giving substantial weight to Dr. Rajyaguru's functional capacity assessment. The record does not show significant, successful treatment of Merino's pain with nerve blocks and ablations. Rather, the record reflects that Merino received some relief from these procedures, but the relief was only temporary. After Dr. Rajyaguru prepared his functional capacity assessment, he noted improvement of pain in Merino's lumbar spine on October 1, 2015, but he did not state in that treatment record that Merino had no pain or limitation of function arising from back and sacral area pain.

For all of these reasons, I recommend that the Court find that the ALJ did not state good cause for giving less than significant weight to the opinions of Dr. Rajyaguru, a treating physician. Therefore, the first assignment of error is meritorious.

NOT FOR PUBLICATION

*Hypothetical Questions to the VE.*

In this two-part assignment of error, Merino alleges that the ALJ erred by failing to properly consider Dr. Rajyaguru's functional capacity assessment when posing hypothetical questions to the VE. If the Court accepts the recommendation that the ALJ erred in his treatment of Dr. Rajyaguru's opinions, then this portion of the second assignment of error is also meritorious.

Merino also argues that the ALJ erred by failing to include limitations in pace in the RFC assessment. She bases this argument on the ALJ's conclusion that she would have moderate difficulties with regard to concentration, persistence or pace. R. 19. As counsel for the Commissioner correctly notes, "concentration, persistence *or* pace" is framed in the disjunctive and, therefore, a finding of moderate limitations in this mental functional area does not necessary include moderate limitations in concentration, in persistence *and* in pace. *Cf. Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997)(observing that a check mark in a form indicating often limitations in concentration, persistent or pace did not necessarily attribute all three impairments to the claimant). Additionally, the record reflects that in at least one written report, Merino wrote that she had no problem completing tasks. R. 310. Therefore, the argument that the ALJ erred by failing to include a specific limitation in pace in hypothetical questions to the VE does not appear to be supported by the record as set forth in the Joint Memorandum.

Nevertheless, as stated above, the second assignment of error is well taken, in part, as it relates to the failure to properly consider Dr. Rajyaguru's functional capacity assessment in posing hypothetical questions to the VE.

NOT FOR PUBLICATION

*Credibility*.

Finally, counsel for Merino asserts that the ALJ's credibility finding was merely boilerplate and, therefore, that the ALJ erred by failing to articulate explicit and adequate reasons to support his credibility determination, as is required by *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). This argument fails. The ALJ cited six reasons to support his credibility finding: (1) Merino's activities of daily living; (2) the degree of medical treatment required; (3) discrepancies between Merino's statements and the information in documentary reports; (4) Merino's demeanor at the hearing; (5) the reports of treating and examining practitioners, medical history and findings on examination; and, (6) Merino's assertions regarding her ability to work. R. 28.

Therefore, the third assignment of error is not meritorious.

## RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** and that the matter be **REMANDED** for further proceedings. I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

## Notice.

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its**

**filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

**Respectfully Recommended** this 26th day of June 2018.

                                      *Karla R. Spaulding*
                                      KARLA R. SPAULDING
                              UNITED STATES MAGISTRATE JUDGE